Case of the morning is number 19-30665 Fusilier v. Landry and we'll hear first from Ms. Friel May it please the court. Good morning, my name is Angelique Friel I'm here today on behalf of the appellant, the Attorney General of the State of Louisiana who is powerless under the laws of Louisiana to enact any of the relief ordered by the district court. Similarly, while I do not represent the governor the same is true for him. Judges, therein lays a primary issue here. The one indispensable and necessary party, the Secretary of State, was voluntarily dismissed with prejudice by the plaintiffs. And when that happened the federal judiciary was deprived of jurisdiction under both Article 3 and the 11th Amendment. But even... I understand that argument regarding an ex parte young and so far as your constitutional claims are concerned but on the Voting Rights Act, that's an act pursuant to the, you don't have an immunity to make what problem or issue. The Voting Rights Act was enacted in authority of Section 5 of the 14th Amendment and operates directly against the state so naming a governor as the chief executive officer, the state is the defendant directly. Well, we have Voting Rights Act cases all the time, your honor, where the Secretary of State is the only person in the state that has the authority to make a decision on a case. And our Constitution, the Louisiana Constitution specifically says that a separately elected official, the Secretary of State is charged with administering the elections laws, implementing it, promulgating those laws. And you don't have to take my word for it. You can take the plaintiff's word for it. You can look at their original complaint. I'm not taking anybody's word for anything. I'm just suggesting to you, raising this issue with you, that is that what happens with a Voting Rights case that you come up with a plan and the plan is reviewed by a court. The court says that, let's say it says it's invalid. I don't need you to issue an order against the state. It's invalid. And if the legislature wants to come back and correct it, they can. If they don't, the court does it. That's what redistricting operates. Really, in those circumstances. I'm just raising this question with you. I understand your arguments about Ex parte Young with regard to your constitutional claims. And I think the absence of a correct party there may or may not be probably an issue. But it's probably a simpler answer to it. There's no occasion of controversy, no standing. But I want to tell you at the outset that if I read these briefs, I would get puzzled about the Voting Rights Act portion of it, not with the constitutional claims and issues. Well, at the end of the day, you have to look at the law that's being challenged. And it's the implementation and the method of electing voters to the 32nd JDC, which the Governor and the Attorney General have nothing to do with. By the same token, for what it's worth, the Secretary of State has no authority to draw different boundaries. Right? I mean, that's what the Louisiana legislature would do. Well, they hold the elections. They promulgate the laws. I understand all that. That's all ministerial once you have districts. Well, if you look at what was alleged by the plaintiffs and what was discussed by the district court, they talk specifically about the injury. The defendant that specifically is charged in implementing the method of electing voters was the Secretary of State. The district court went on to say that the injuries are traceable by the Secretary of State, that he's not an impotent defendant, that if you look at the allegations, they're not conclusory. They're facts supported by the law. That would seem to be a violation of the principles of federalism by the Tenth Amendment. The Voting Rights Act is a great incursion into the principles of federalism, so I'm not really impressed about that. I mean, I had the same puzzlement that Judge Higginbotham did, and I would like to know what case is there out there anywhere in the 50, nearly 60 years after the Voting Rights Act where there's been a question of standing raised like this? To the extent that I'm asserting the issue with regard to the Tenth Amendment, the Nipper case says from the inception of a Section 2 case . . . This is not a Tenth Amendment case. I mean, we're talking about redistricting under Section 2 of the Voting Rights Act. That's your minimal . . . that's their basic claim. But there has to be a workable remedy. There has to be a workable remedy. There was a workable remedy in the form that Judge Higginbotham . . . the legislature could have passed a new law regarding the districts. Could it not? Well, it's certainly within the purview of the legislature to do that. I certainly understand your discomfort with the idea that . . . and I think the argument made that if we can sue the Governor and Attorney General and there is, quote, standing, then that's a backdoor to attack any law that the legislature passes. But I do think that the Voting Rights Act created a different structure. Well, I just want to mention Lou Lack v. Clemons, which is a case Judge Higginbotham and Judge Jones, I know you're very familiar with. It talks about why it was appropriate in that case to name the Secretary of the State, the Governor, and the AG. Because in Texas, there is an actual board that these elected officials sit on for purposes of redistricting the judiciary. There is nothing like that in Louisiana. We don't have that. And, you know, with regard to these earlier cases where perhaps the AG and the Governor was a defendant, I don't know why they didn't raise motion to dismiss, but I have a pretty good idea that with regard to the Attorney General, all of these other Voting Rights Act cases also included claims under Section 5. And the AG is the elected official that is required to submit things for preclearance. This is not a Section 5 case. It's clear under the jurisprudence that Section 2 and Section 5 are different. You can spend your time however you wish, of course, but I would suggest to you that you have much more powerful arguments than we might want to make. I agree, Your Honor. So, in addition to that, you know, obviously we do raise the 11th case out of the Fifth Circuit, City of Austin. The state does not have immunity from the Voting Rights Act. There's a little, I mean, we fought a civil war over that. That's the 14th Amendment, which runs in Section 5. Let's talk about the merits of the case for a moment. Sure. I think that's what we're mostly about. Sure. Absolutely. With regard to the merits and whether or not there is impermissible vote dilution, the trial court erred in determining that the plaintiffs were able to satisfy Jingles Precondition 1, which is that the population is sufficiently large and geographically compact to constitute a majority in a single-member district. For your ease of reference and for the Court's consideration, we actually provided this morning a copy of what is our position that based on the face of the remedial plan, it is evident that you cannot satisfy Jingles 1 because this remedial plan itself is a racial gerrymander. You can look at the plan and you can see that it's barely contiguous. When you start at the very top, it separates these small census-designated areas of Schriever and Gray and connects, in order to maintain contiguity, with roads and with the bayous. In one place, it shrinks down. Let me give you one more comment so it might help you. At least speaking for myself, linkage is a very powerful constraint. By linkage, of course, we mean that you have coterminous boundaries of the jurisdictional basis you run for office, your county, and the jurisdiction. If you have, for example, judges of a county, then there are jurisdictions of the county that are elected from the county. They're coterminous. It's linking. You don't break up counties. Absolutely, Your Honor. We fought that years ago. We've been down this path years and years and years ago. The Supreme Court, speaking to Justice Stevens, made it quite clear that they would like to create trial courts where they have the litigants before them. It just creates obvious problems without going into detail. I don't want to put that out to you. That's a large problem here in this case. Absolutely. The trial court erred in not giving the appropriate weight to the linkage interest. He basically indicated that because there was a settlement in the county, there was a settlement in the county. I would frame the question to be whether or not there's a sufficient case been made here sufficient to overcome the breakage of linkage here. The court articulated the standard. The court says it's not an absolute prohibition, but it's a powerful one. He said, well, you couldn't do it without it. That raises a standard and burden. I think that's where we are legally. The district court found that we stifled the linkage argument. Our position at Clements stands for the position that linkage is a substantial state interest automatically. Judge Jones, in your footnote 23 in Prejean v. Foster, you cite two constitutional provisions of Louisiana law that still exist today that support the fact that linkage has been a tremendous state interest as early as 1868. That's Article 5, Section 5 and Article 14, Section 16. That remains true. Terrebonne Parish is a parish composed of five judges that exercise parish-wide territorial jurisdiction, unlike appellate courts where you have a possibly functional analysis where you have to determine whether or not they collaborate on cases. That is not the case in Terrebonne Parish. There was testimony from Representative Hunt Downer that the reason for maintaining the outlarged districts was because of linkage interest. There was testimony from every sitting judge at the trial that discussed the concerns with breaking the link between the electorate and the judges. I thought that a number of other parishes in Louisiana do elect judges by district. The only ones that do, 11 out of 41, came after the Clark litigation in the early 90s. Nine of them you can see specifically in the adjudgment. Two, there were objections to preclearance that were settled as part of the consent decree, and around the same time there was threat of eminent suit with the 16th JDC, and so they went ahead and created the subject district. Overwhelmingly, the other JDCs, 30 out of 41, respect that linkage interest. The only ones that do not is because they settled litigation. And what was interesting, and it was clear error, is the trial court counted up the number of judges in Louisiana and said there's 106 that are elected from sub-districts out of 170 or 80. I apologize if I don't say the correct number. What he didn't do was include Orleans Parish, which has the largest group of minority judges. They're all elected at large, which demonstrates that Louisiana still considers linkage to be a compelling interest, and had those numbers been included in the district court's calculation, you would see that in no way is the majority of the district court judges elected from sub-districts. I just want to talk about Jingles 1, because we think it is a racial gerrymander. If you look at the plan, you'll see that it's underpopulated, and they barely achieve the 50% threshold. The black voting age population is 49.7%, which means they don't meet the numerosity requirement unless they aggregate any part black. It got extreme, not abiding by traditional redistricting principles, drawing a district that's not compact. Underpopulating, they only get it to 50.4%. What's the total population of Tarabona Parish? The total population as of the 2010 decennial census was approximately 111,000. The minority population was roughly around 18,800. The actual voting age population, which we know is what you have to use for purposes of voting rights claims, is 82,737, with the black voting age population of 14,420. So it's not even a fifth of the total population that's made up from the minority members. I also want to say with regard to Section 2, they analyzed one endogenous election from the early 90s. There is very little that an election from 25 years ago will tell us about voting patterns. If you look at Defendants Exhibit 4, Angele Romig does her own analysis that very few of those people even exist on the rolls. They failed to take into consideration the election of Judge Juan Pickett in 2014. He was a minority judge who was admittedly the candidate of choice from one of the plaintiffs, Daniel Turner. I think I'm out of time right now, but I'd like to talk a little bit about more when I have an opportunity after the plaintiffs. Thank you. Okay. Thank you very much. All right. Ms. Aden. May it please the Court. I am Leah Aden, and I represent the plaintiff appellees in this straightforward Voting Rights Act lawsuit in which Judge James Brady made no clear error in finding a strong case of vote dilution. This was after he held an eight-day trial where he weighed the testimony and determined the credibility of 27 witnesses, including seven experts, and considered over 350 exhibits. The trial court made no clear error in finding that there is a stark pattern of racially polarized voting in Tarrant Parish elections, such that no Black candidate has ever won in a contested election for the 32nd JDC. Indeed, Black voters have given an average of 87% of their support to the Black candidates of their choice, but in those very same elections, non-Black voters have given an average of As the Supreme Court in Jingles and Judge Higginbotham writing for the majority of the court in Clark v. Calhoun County found and recognized, racially polarized voting, the lack of Black electives, the complete canceling out of Black voters' preferred candidates in elections in Tarrant Parish, that constitutes the heart of a Voting Rights Act case. And after giving Louisiana's legislature and defendants two legislative sessions in order to cure the strong case of vote dilution that the district court found, Judge Shelley Dick was well within her discretion to order a court-drawn remedy that builds upon the choices that Louisiana's officials have already made in redistricting. If the court doesn't have any questions about whether both defendants are proper parties, I will turn to the linkage argument. In Houston Lawyers Association, the Supreme Court and Judge Higginbotham writing for the majority in Clements with Judge Jones concurring, they specifically rejected the Attorney General's argument in Texas that Louisiana seeks to make here, which is that there is this per se substantial linkage interest. That is a question of law indeed, but it is one that is not per se. In fact, in Clements, this court spent a number of pages assessing whether Texas has a substantial linkage interest, and it found that it did. Here, however, the district court didn't err in the totality of the circumstances in finding, as a matter of fact, that Louisiana's linkage interest is indeed not tenuous. But it found then, as a matter of law, that it was not substantial. And it did so based upon a number of key findings. The first is that Louisiana's Constitution, unlike Texas's, it simply doesn't require at-large voting for district trial courts. It noted this court's opinion... If the district court found that Louisiana's linkage interest is not substantial as a matter of law, does that mean we review it de novo? That is correct, Your Honor. And in reviewing it de novo, this court should consider that in Judge Higginbotham's majority opinion for the court in Clements, and footnote 33, this court recognized that Louisiana and Mississippi, unlike Texas, has, quote, abandoned its linkage interest beginning with the Clark litigation. But it didn't stop with that litigation. It continued on voluntarily when Louisiana chose to disregard, subjugate its policy interest in at-large voting and to voluntarily adopt district-based voting, not just for the Louisiana Supreme Court, the highest court in this state, but also for circuit courts and trial courts. The 16th JDC that neighbors Terrebonne Parish has district-based voting. What's your explanation for Orleans Parish? Orleans Parish, if the court goes back to the record in Clark, that was the exceptional parish in the late 1980s, early 1990s, where there was a handful of black lawyers who had access to the judiciary in Louisiana because of the demographics in this population. That is a far cry... Was I wrong in Prejean to say that there had been a linkage interest for 100 years? You were not correct, but that linkage interest has a history. Pardon me, I disagree with you because the fact is that until Clark v. Romer, there was not a single districted jurisdiction for courts in Louisiana. Isn't that correct? That is correct. Well, that means that there was a linkage interest. There was a linkage interest, and you recognized in footnote 33 that Louisiana abandoned it, both as a matter of a litigation choice, but also voluntarily subsequently, such that today... You say abandoned. Those are your words, Your Honor. Fine, but that didn't have much to do with Texas, did it? Which was the subject of that lawsuit, and abandonment is not a legal thing like waiver. It's something that's subject to the facts and circumstances of a case before the court. This court used the language abandoned, and it used it in the context of the Clark litigation. I submit to you that the district court didn't err by considering that as a legal thing. But it does suggest that Louisiana does not still hold dear that basic principle, and as you stated, that arose in a contest in which they settled for this specific situation to do that. So it was a compromise and a back off, at least, for that purpose. The backdrop of that, as I understand it, correct me if I'm wrong, and I know you will, is that Louisiana still maintains, as just about every state that looks at this, that you dearly much prefer, at the least, you much prefer to have a trial court elected countywide, and I'll use counties, or parishwide, whatever, and the same voters voting for the . . . you don't have the subdivision which creates this difficulty. So I think the interest is still there. You didn't waive it away. The way it plays out in the formulation of Justice Stevens is whether or not there is a sufficient interest here to overcome that. The district court in one line just said, well, basically, it's enough, with no analysis of any kind as to whether it's otherwise achievable. So, Your Honor, I completely agree that even if this court is persuaded that there is not a substantial linkage interest, and even though Louisiana has a substantial linkage interest, the question is whether the necessity of overturning it. Yes, and the district court recognized that the law requires him to then consider whether, even if he has a substantial linkage interest, Louisiana has a substantial linkage interest, is it overweighed, outweighed by proof of substantial vote dilution, and he found that it did. Could you not draw a map that adhered to the linkage interest and that would also provide you a district in which a minority could be elected? In other words, you'd basically get where you are now, but do it with adherence to that standard. As the court recognized, the way this is drawn, you can't do it, but that's not the question. The question is, could you have drawn it some other way and achieved that? The legislature had two opportunities to do that. Once this court found a strong case of vote dilution and it just abandoned its obligation to do that, and then it became incumbent upon the district court to adopt a remedy. That's right, but that plan, could it have been drawn in a different way that abided those interests? And that's the question. You don't just say, well, here's the map. Well, once the court had the authority and the obligation to draw a remedy, it was guided by the Supreme Court and this Fifth Circuit's principle, which has a strong preference for single-member districts, unless the defendants or the court is satisfied that there are exceptional circumstances that exist where some other method of election has been adopted. But it proceeded to use... But I didn't see those findings about that. It was not asserted that there was those exceptional circumstances that existed. Pardon me, but my recollection may be that this particular plan can't be accomplished without that, in essence, or effectively. Well, and going back to the substantial proof of vote dilution that outweighs the state's linkage interest if the court agrees with it, the court predicated that decision. It looked at Clements. It looked at the fact that this court went county by county and looked at racially polarized voting. It looked at the number of minority elected. It looked at a host of Senate factors, and it found that in six of the counties there was no vote dilution and only marginal vote dilution in three of them. That is in stark contrast to Terrebonne Parish, where the racially polarized voting is simply uncontested. It is predicated upon the court accepting the proof of Dr. Richard Engstrom, who cited by the Supreme Court in Thornburgh v. Jingles the landmark vote dilution case, where he found that Terrebonne Parish presents the starkest, if not the most stark racially polarized voting that he has ever examined in a hundred voting rights cases. The court predicated its substantial finding of vote dilution on the fact that seven of the nine Senate factors that Congress laid out that courts must consider, they weighed in plaintiff's favor, including two of the most important that Judge Higginbotham recognized were the most important. I'm sorry to interrupt, but in every Section 2 case, seven of the nine Senate factors weigh in favor of finding a remedy. That's not correct, Your Honor. There are certain cases where one or two are sufficient. Well, that's my point. They are makeweights that heavily go toward the plaintiffs, as long as we're going to say that history of segregation persists. That's actually, that's not correct. This court, in its own precedent, acknowledged that it's the rare case, Judge Higginbotham recognizes, the rare case that people can establish the three Jingles factors and not establish the totality of the circumstances. It is the rare case where you have seven of nine Senate factors weighing in plaintiff's favor. That's all I was saying. Okay. It's the rare case where you find seven of the nine Senate factors weigh in plaintiff's favor, and it is a far cry that the court only considered the ongoing record of a history of discrimination. It considered the racially polarized voting. It considered the lack of responsiveness of Louisiana officials to black voters. It considered the enhancing factors. It considered the lingering effects of discrimination. May I ask you a question? Yes. Is the parish, isn't there a county commissioner's sort of Board of Supervisors or something of the parish? There is a local Board of Supervisors, and the Attorney General is the legal advisor under a Louisiana election. That's fine, but are they elected at large or in short of its electoral method? I'm most familiar with the other positions that are at large that have never had black candidates. That's for the home of city court, for the constable, for the sheriff, for the coroner, for the clerk of court, for the city marshal, for the tax assessor, for the district attorney, for the parish president. No black candidates have ever been elected because of the stark racially polarized voting, which is discrediting the district court's discretion in adopting a remedy to it. I'd like to turn to the district court's, the appropriateness of the district court's remedial order, which is subject to the very demanding standard that the district court abused its discretion in adopting that. Before you do that, would you mind responding to Ms. Freel's argument about numerosity in Jingles Precondition 1? It's undisputed. Her own experts concede that the Jingles 1 map is sufficiently large under any measure, whether you use the any part black measure or you use the non-Hispanic DOJ black measure. It is above 50%, the bright line Bartlett versus Strickland rule, and there's no dispute in Jingles 1. They make a argument in the remedial district that the court abused its discretion in crediting the use of the any part black category, which is 50.4%, and the non-DOJ black category is 49.7%, just a short, slight below 50%. But they have cited no Supreme Court, no Fifth Circuit law that says that the use of the any part black category is improper, and that's an abuse of discretion standard that the court is allowed, has the deference, the discretion to use that standard, and importantly, the court considers the effectiveness of that. If the district court didn't abuse its discretion in using any part black, then you're over the 50% threshold. And neither the liability nor in the, well, it's not a clearly erroneous finding in liability phase, and it's not an abuse of discretion in the remedial phase of using the any part black category. The Supreme Court has guided courts to actually use that category when you're dealing with a black population that's here. You're not dealing with a coalition district. You're dealing with people who self-identify as black, and they have cited no court which would have required the district court to have used another category. Any part black. That harkens all the way back to Plessy. Excuse me? Any part black. That was the genesis of Plessy. Well, no, it's a census category that's been used since 2000 and allows people to self-identify as whatever they would like to be. Self-identify black and other things. I wouldn't make it another. A joke that I missed. I don't want to take up your time, but the original origins of Plessy. They didn't come to our court. They didn't like the judges there. It was litigated in the state court, but what originally sparked that was the same issue of what's black. Those are racial categories and constructs that my clients are not responsible for creating, but they exist. What is important, going back to the remedial plan, what is important is that the district court follow the guidance of Louisiana officials in coming up with a remedial plan that was not an abuse of discretion. It looked at a district that in areas of the district that have already been combined by local officials for the parish council. It noted that those made sense to combine black voters in that district because they are a community of interest. They share schools, places of worship, similar socioeconomic indicators, and similarly the shape and the statistical measures of compactness in that district. They resemble and are consistent with the norm for other districts that Louisiana officials have adopted. Let me ask one question. I hate to interrupt you. You have a great command of the case. What was the alternative plan submitted to the trial judge? Any alternative plan that would have made a greater combination of linkage before the court? What is important, Your Honor, is that plaintiffs were responsible for submitting two of the remedial maps and the special master considered two others, all of which considered and had single member districts. Because the district court didn't get it wrong, the Supreme Court has said that single member districts are the preferred remedy. My question was a factual one. Were there alternative plans submitted? All of which had all five single member districts. Yes. And what I would like to note for the record, though, is that we made the district court aware that Louisiana has also chosen that as a policy interest for other parishes. The 18th, 27th, and 40th JDCs in all use five or all use not the name number five, but all use pure single member districts. That is at record site 30487. So it's simply not the case that Louisiana has subjugated the use of pure single member districts for trial courts in Louisiana. These are in use today and they have shown themselves to be able to effectuate fair justice for black voters there. The 1996 Supreme Court task force in 1996 saw then that one of the only feasible means to ensure diversity and to ensure the appearance of fairness in Louisiana's judiciary is the creation of sub districts. And that is what plaintiffs have been striving for decades to achieve in Terrebonne Parish. They have been canceled out. That is the language that this court has used in a way that I don't know that I would have ever heard of. But they have been canceled out. Excuse me? There was a black fellow who served as a judge. And I thought he was reelected. Yes, your Honor. And Judge Pickett's election reflects the quintessential special circumstances that the Supreme Court recognized often happens in cases like these. You know what? I mean, that's often how things start with special circumstances. It should have started with Clark and it should have continued through Trism and it should have continued when the rest of Louisiana was moving. You're setting forth a premise that there must be diversity on the bench. And certainly that is a possibility and it may be a desideratum. But usually small things start with one or two, you know, developments and then they mature on their own. Black voters in Terrebonne, respectfully, Judge Jones, have been waiting for decades and they should not wait anymore. But my point, I mean, the judge didn't take into account the election of that fellow. The judge, respectfully, and I'm running out of time, I'd love to answer this question. Judge Brady did not clearly err in taking serious consideration of Judge Pickett's election. He followed Supreme Court precedent, which recognized that a judge who is elected after litigation is filed, a judge who is elected as a first-time judge, a candidate for an open seat, made history not only in Terrebonne Parish but throughout Louisiana by being uncontested. There were 160 white lawyers who could have contested him in Louisiana over a 24-year period. No other black judge ran uncontested for a majority white district. That's to his credit, but you can't use that against Louisiana. The district court didn't clearly err in making a finding that that election was, even if it was probative, doesn't change the outcome. Yes. You've got a lot to say, but . . . I do. This is important. Thank you, Your Honor. Okay, Ms. Freel. Yes, Your Honor. I just want to point out that in 2008 and 2014, which are the most recent election cycles for this particular court, all elections were unopposed, every single one of them. In Terrebonne Parish, there is a limited pool of minority lawyers that can qualify for judge. Judge Higginbotham, you saw in the trial, the evidence is that there was approximately 10. As it relates to the last election cycle for judge, 2014, you had Judge Pickett, who was a candidate, who won. You have his wife, that's one of those 10 that's a lawyer, and you have one other lady who ran for city court judge, Cheryl Porter, so she would have been precluded from running for judge of the 32nd JDC. Note, while she was a lawyer that lived in Terrebonne Parish, she worked for the state in Baton Rouge, so that's a factor. Again, no one has put themselves out there. In the entire history of the court, you had a black candidate that ran in the early 90s. I thought I read something about the history that we're looking at here, that when the usual cry went up, we need more judges, because of the increasing dockets, a familiar thing to all courts, that suddenly when it appeared that necessity was going to be in a predominantly black area, suddenly the problems of the docket disappeared. Now that's it. I'm using descriptive language as I can. In the entire history of the court, that Terrebonne Parish qualified for an additional judgeship, that was around 1997. That determination is based on a judicial council. They don't consider race as a factor. They look at workload. They look at access to justice. You had a legislature, Hunt Downer, who proposed legislation. Local constituents came to him and said, we would like this to be a minority judgeship. Here is a map. That is Plaintiff's Exhibit 17. He could have ignored it. He said, give me the map. He gives it to staff. They look at it. It's noncontiguous. They could have stopped there. They went further and tried to fix the map. When they did, they said, we can't do this without being a racial gerrymander. Let's table it. Let's try to fix it. What alternative map did you submit to the trial judge? Did you submit an alternative map? In the remedy phase, our expert tried to draw a map and testified that we could not draw a map that complied with Jingles 1. With regard to the plaintiff's illustrative plan, it didn't comply with Jingles 1. Out of the map, which consisted for the single member district of 23 precincts, which are traditional boundaries that have to be considered, over 14 were split. It's very easy to draw a map if you don't comply with traditional redistricting. 14 precincts are split? Yes. Some multiple ways. That goes to the fact that you cannot satisfy Jingles 1 without creating a racial gerrymander. With regard to the remedy here, if the legislature couldn't draw that map, why should the court be able to draw that map? They should not have a different standard. It still has to be constitutional. With regard to linkage, Your Honor, the fact of the matter is that the only JDCs that were created were as a result of breaking that linkage standard. In fact, Louisiana has been sued over the sub-districts, most recently in the case Campbell v. John Bel Edwards, where a minority lawyer says, I ran in a sub-district and lost. Had I had an opportunity to run at large, I would have won. It is an issue that we will face time and time again. Linkage is a substantial interest. It is recognized by the law. It has to be considered. We ask that you reverse and dismiss the case. Thank you very much.